## THE VISITORS and GOVERNORS of ST. JOHN'S COLLEGE *vs.* THE STATE of MARYLAND.— THOMAS H. HICKS, GOVERNOR.

The Act of 1784, ch. 37, (the Charter of St. John's College,) recites in its preamble that many public spirited individuals, from a desire to promote the founding of a college, *have subscribed* and *procured subscriptions,* to a considerable amount, and that there is reason to believe large additions to such contributions will be obtained if a charter is granted, and that the Legislature, approving of these exertions, were desirous to embrace the then favorable occasion of peace and prosperity for making lasting provision for the encouragement and advancement of all useful

DECEMBER TERM, 1859. 331

Visitors & Governors of St. John's College *vs.* The State & Governor.

knowledge and literature, through every part of the State. The Act then constitutes certain persons agents to *solicit* and *receive subscriptions* to the college, provides for the incorporation of the Visitors and Governors, to be elected by the subscribers by the name of "The Visitors and Governors of St. John's College," with power to fill vacancies in their body, and to have perpetual succession, &c., and in order to provide a permanent fund for the further encouragement and establishment of said college, it was enacted by sec. 19, that the sum of £1750, current money, *"be annually and forever hereafter given and granted as a donation by the public to the use of said College."* The sum of $32,000 was contributed by corporations and individuals, towards the founding of this college, which was duly organised, and has ever since existed, as a corporation under the provisions of its charter. By the Act of 1805, ch. 85, the Legislature *withdrew the donation* of £1750, and *repealed* the 19th section of this charter. HELD:

1st. That the annual appropriation of £1750, made by the 19th sec. of the Act of 1784, ch. 37, constitutes, under all the circumstances of the case, a contract on the part of the State which could not be legally repealed by the Act of 1805, ch. 85.

2nd. That the Act of 1805, ch. 85, was a violation of the tenth section of the first Article of the Constitution of the United States, which declares that no State shall pass any law impairing the obligation of contracts.

3rd. That the Act of 1784, ch. 37, with the circumstances of the case, constitutes such a contract as would, if entered into between individual citizens, be legally binding upon them.

APPEAL from Equity side of the Circuit Court for Anne Arundel county.

By Resolution No. 4, of the Legislature of 1858, it was *resolved:* "That His Excellency, the Governor, be, and he is hereby authorized and required to cause such proceedings to be instituted as may be necessary to obtain the opinion of the judges of the Court of Appeals of Maryland, whether the annual appropriation made by the 19th section of the Act of 1784, chapter 37, of the sum of £1750, current money, to be applied by the Visitors and Governors of St. John's College, to the payment of salaries, &c., constitutes a contract on the part of the State, under all the circumstances of the case, which could not be legally repealed by the Act of 1805, chapter 85, by the Legislature of this State; whether this latter Act is not in violation of the 10th section of the

332 MARYLAND REPORTS.

Visitors & Governors of St. John's College vs. The State & Governor.

1st Article of the Constitution of the United States, which declares 'that no State shall pass any law impairing the obligation of contracts;' and whether the former Act, with the circumstances of the case, constituted such a contract as would, if entered into between individual citizens be legally binding upon them; and that the result of such proceedings be reported to the Legislature at its next session; *provided*, that nothing in these resolutions, or any decision under the same, shall in any mannner compromise the State, or bind her by the decision of said court, or commit her to the payment of any costs or charges in settling the questions involved in the aforesaid resolutions, or to authorize the Governor to employ counsel in the discussion of the matter before said court."

In causing the necessary proceedings to be instituted under this resolution, the Governor being advised that he ought to occupy the position in court of defendant, it was agreed and arranged with the Visitors and Governors of St. John's College, that if they would file their bill, setting forth fully, in detail, the grounds of their complaint against the State, the Governor would appear to the suit and on behalf of the State answer the bill, and the bill was accordingly then filed in the court below on the 28th of May 1859.

This bill states that the Visitors and Governors of St. John's College were incorporated by the Act of November Session 1784, ch. 37; that, in the preamble to this Act, the Legislature—after reciting "that institutions for the liberal education of youth in the principles of virtue, knowledge and useful literature, are of the highest benefit to society, in order to train up and *perpetuate* a succession of able and honest men for discharging the various offices and duties of life, both civil and religious, with usefulness and reputation, and that such institutions of learning have accordingly been protected and encouraged by the wisest and best regulated States,"—declares, "that it appears to this General Assembly that many public spirited individuals, from a desire to promote the founding a college on the Western Shore of this State, have subscribed and procured subscriptions to a con-

siderable amount, and that there is reason to believe that *very large* additions will be obtained in the different counties of said Shore, if they were made capable in law to receive and apply the same towards founding and carrying on such college, with *such plan* and with such legislative *assistance* as the General Assembly might think fit;" and further declares, that "this General Assembly, highly approving those generous exertions of individuals, are desirous to embrace the present favorable occasion of peace and prosperity for *making lasting provision* for the encouragement of all useful knowledge and literature through every part of the State;" that by the 2nd sec. of this law it is enacted, "that a college or seminary of learning, by the name of St. John's College, be established on the said Western Shore, upon the following *fundamental* and *inviolable* principles, namely: *first*, the said college shall be founded and maintained *forever*, upon the *most liberal plan*, for the benefit of youth of every religious denomination," &c.; *secondly*, that there shall be a *subscription carried on* in the different counties of the Western Shore, on the plan on which it hath been opened for founding the said college," &c.; *thirdly*, when any of the said Visitors," &c., "shall die," &c., "a quorum shall proceed to a new election to fill the vacancy," &c.; that by the 3rd sec. John Carroll and others were appointed as agents "to solicit and receive subscriptions and contributions," for the establishment of this intended college and seminary of universal learning, and that, by the same section, the subscribers of every £1000, Maryland currency, who shall have paid or secured to be paid the same to the Treasurer of the Western Shore, &c., and lodged their subscription papers with him, &c., were entitled to elect one Visitor or Governor of the College; that by the 4th sec. it is declared "that when thirteen Visitors and Governors shall be chosen they shall meet and take upon them the discharge of their trust," and the thirteen Visitors and Governors are declared "one community, corporation and body politic, to have continuance forever, by the name of the Visitors and Governors of St. John's Col-

lege, in the State of Maryland, and by the said name shall have perpetual succession.

The bill further states that the preliminary amount necessary to be subscribed before the organization of the college was reduced by the supplemental Act of November session 1785, ch. 2, and that the sum of £11,000, Maryland currency, was actually subscribed and paid into the State Treasury as required by the original Act, (as appears by exhibit No. 1, filed with the bill,) whereby the subscribers became entitled to elect, and did elect, the number of Visitors and Governors required as preliminary to the vesting of the corporate privileges, powers and duties granted and declared by said Act; that being thus organized as a body corporate, said Visitors and Governors duly fixed upon the city of Annapolis as the proper place for establishing the college, and received and held the lot of ground in that city granted them by the 7th sec. of said Act, and on this and other adjoining lots in said city, held by them, they have erected large and extensive buildings for the better execution of the various important purposes of their incorporation, and which they now hold for the same purposes; that from the time of their original organization to the present, they have continued to exist as a corporation by the regular appointment of Visitors and Governors, as vacancies have occurred, in conformity with the Act of incorporation, and have conducted said college, from its first organization and do now conduct the same, upon the fundamental principles declared and established by said original Act and its supplements.

The bill further states that, by the 16th sec. of said charter, it was provided and enacted that, in case at any time hereafter, through oversight, or otherwise through misapprehension and mistaken construction of the powers, liberties and franchises in this charter, granted or intended to be granted, any ordinance should be made by the said corporation of Visitors or Governors, or any matters done or transacted by the corporation contrary to the tenor thereof, although all such ordinances, acts and doings shall, in themselves, be null and void, yet they shall not, however, in any courts of law,

or by the General Assembly, be deemed, taken, or interpreted, or adjudged, into an avoidance or forfeiture of this charter or Act of incorporation, but the same shall be and remain unhurt, inviolate and entire unto the said corporation of Visitors and Governors, in perpetual succession, and all their acts conformable to the powers, true intent and meaning hereof, shall remain in full force and validity, the nullity of and avoidance of such illegal acts to the contrary notwithstanding; that by the 17th sec. it was enacted that this charter shall be construed in all cases most favorably on the behalf and for the benefit and behoof of the said Visitors and Governors, and their successors, so as most effectually to answer the valuable ends of this Act of incorporation, towards the general advancement and promotion of useful knowledge, science and virtue.

The bill further states that the 19th section of said charter is as follows: "And to provide a permanent fund for the further encouragement and establishment of the said college on the Western Shore: *Be it enacted,* that the sum of one thousand seven hundred and fifty pounds, current money, be *annually* and *forever hereafter given and granted,* as a donation by the public, to the use of said college on the Western Shore, to be applied by the Visitors and Governors of said college, to the payment of salaries to the principal, professors and tutors of the said college;" that "as a certain and permanent fund to procure the said sum of £1750, current money, annually, for the use of said college," the Legislature, by the 20th, 21st, 22nd, 23rd, 24th, 25th, 26th, 27th, 28th, 29th, 30th, 31st, 32nd and 36th secs. of said original Act, provided that the sums to be received by the Treasurer of the State for marriage licenses, for fines and forfeitures, for ordinary licenses, for hawkers and pedlars licenses, &c., &c., *"shall remain in his hands in every case subject to the order of the · Visitors and Governors of the said college, to be drawn according to the directions of this Act;"* that further, for the purpose of creating a *certain and permanent fund,* to procure the said sum of £1750, current money, annually, as declared in the 20th sec. of said Act of incorporation, cer-

tain taxes which had been before paid into the Treasury for the general purposes of the State, and also certain other taxes, by said Act then for the first time imposed, were by the 20th, 21st, 22nd, 23rd, 25th and 32nd secs. of said Act, devoted and especially appropriated and directed to remain in the hands of the Treasurer of the Western Shore, subject to the order of the Visitors and Governors of said college, to be drawn according to the directions of said Act, and the *balance only, if any, was, by the 36th sec.* of said charter, to remain in the Treasury of the State, subject to the disposal of the General Assembly; and the bill alleges that the sums of money received into the Treasury from the sources of revenue thus set aside and specially appropriated "to procure the said sum of £1750," so given and granted to the said college, "as an annual and perpetual donation forever," exceeded the sum intended to be secured thereby, and that, at the present time, the amount annually paid into the Treasury from these sources does not fall short of a quarter million of dollars.

The bill further states that from the period of the first organization of said corporation, the said sum of £1750 was annually paid to the Visitors and Governors by the Treasurer of the Western Shore, until the year 1805, at which time that officer refused to pay the same, or any part thereof, assigning as the reason of such refusal the passage, on the 25th of January of that year, of the Act of 1805, ch. 85, which professes to repeal only the 19th section of the Act of 1704, ch. 37, by which the said annuity was, as before stated, given and granted to the said Visitors and Governors in perpetuity, and leaving the 20th, 21st, 22nd, 23rd, 25th, 32nd and 36th secs. of said law, whereby the funds raised by these sections, and thereby directed to remain in the hands of the Treasurer of the State, subject to the order of only the said Visitors and Governors, to be drawn according to the directions of the said Act, unrepealed and in full force and operation; that the Treasurer of the State continued to withhold all and every part of said donation of £1750 from the passage of the Act of 1805, ch. 85, until the 6th of January 1812, when, under

Resolution of 1811, No. 38, he was directed to pay to the said Visitors and Governors the sum of $1000 annually thereafter, and which, from that time to the present, he has accordingly paid to them; that no further or other sum was paid to them until the 2nd of March 1832, when the additional sum of $2000 was, by Resolution of 1832, No. 41, directed to be paid, and that, from that time to the present, the said sums of $1000 and $2000 have been annually paid by the Treasurer to the said Visitors and Governors, and no other or larger payments have ever been made by the State to them; that although there was a proviso annexed requiring, in order to receive the sum of $2000, under the Resolution of 1832, No. 41, that the same should be accepted in full satisfaction of all legal and equitable claims which the said Visitors and Governors may have, or be supposed to have, against the State, and although the same may have been so accepted by them at that time, yet they aver and charge that the same was accepted in ignorance of their rights through oversight, or otherwise through misapprehension and mistaken construction of the powers, liberties and franchises in their charter, and is to be held under the 16th and 17th sections especially, and under their charter generally, as utterly null and void, and they charge that the General Assembly, in their Resolution of 1858, No. 4, so regarded said acceptance.

The bill then charges that, though the said Visitors and Governors insist that the Act of 1805, ch. 85, was in violation of their vested rights, and null and void under the Constitution and laws of this State, and the Constitution of the United States, yet they are advised and so state, that this Act of 1805, ch. 85, did not, even in its terms, attempt to appropriate the said amounts of £1750 to be retained in the Treasury for the general purposes of the State, but the same were, by the express words of the 1st section of that Act "to be and remain in the Treasury, subject to the appropriation of the Legislature to literary purposes, and for disseminating learning in the several counties in this State, and not to other or different purposes," and they charge that the same have

43      v.15

338   MARYLAND REPORTS.

Visitors & Governors of St John's College vs. The State & Governor.

never been appropriated, and that it would have been illegal so to have appropriated the same, and that the said annuities and the balances thereof due to the said Visitors and Governors, are to be considered as virtually and in legal contemplation, as yet remaining *"in the hands of the Treasurer, subject to the order of the said Visitors and Governors, to be drawn according to the provisions"* of the said Act of 1784, ch. 37.

The bill further charges that, by reason of the subscription and payment into the Treasury of the sums specified in Exhibit No. 1, by the individuals and corporations therein named, at the solicitation of the State, through the agents appointed for that purpose by the Act of 1784, ch. 37, and upon the pledge contained in the 19th and other sections of that Act, before enumerated, that the State would pay annually forever thereafter, the sum of £1750, current money, to be applied with said individual and corporation subscriptions to the establishment and permanent maintenance of said college, the State could not legally or constitutionally repeal the 19th section of that Act, nor revoke the said appropriation, or withhold its annual payment from the said Visitors and Governors, nor could they authorise the same to be done; that the Act of 1784, ch. 37, was in terms and effect a contract entered into by the State with the individuals and the corporations who subscribed and paid the money thereby required, that the State would on its part, in consideration of such payment, forever annually thereafter pay to the said Visitors and Governors the sum specified in and perpetually appropriated by that Act for the permanent maintenance of said college, and that the individual and corporation subscribers would have the same right to demand the repayment to them of the money paid by them for the establishment of this college, as the State could rightfully claim to withhold the said annuity, and that the Act of 1805, ch. 85, is therefore unconstitutional and void; and that the aggregate of the annual differences between the said annuity of £1750, appropriated to be paid by the State to the said Visitors and Governors, and the sums which they have actually received as herein-

before stated, with interest on such differences from the times the same were withheld, is the amount which the State equitably and legally owes to them.

The bill further states, that though, by the 9th section of their charter, the said Visitors and Governors are authorised to sue in any court of this State and elsewhere, in as full and effectual a manner as any body corporate within this State or any of the United States of America, in like cases, may or can do, yet because of the doubts entertained by some, and their want of means to carry on what may be a protracted litigation with the State, they made application to the Legislature at its last session for relief, when it passed the resolution hereinbefore referred to, under which these proceedings are authorised and have been instituted. To the end, therefore, that the said Visitors and Governors may have an account, under the direction of the court, of the aforesaid annuity, and of the balances thereof unpaid and due to them, with the interest that may accrue thereon, and that the purposes of the Legislature may be accomplished, and the opinion of the Court of Appeals obtained, as set forth in said resolution, and that the State and the Governor may further prosecute these proceedings, and that the said Visitors and Governors may have such other and further relief as their case may require, a summons is prayed against his Excellency, Thomas H. Hicks, Governor of Maryland, to appear and answer the matters and statements set forth in this bill.

The Governor, in his answer, admits that the Visitors and Governors of St. John's College were incorporated by the Act of 1784, ch. 37, the preamble and provisions of which are, in general terms, stated in the bill. It is also admitted that by the 19th sec. of that Act the sum of £1750 was annually and forever thereafter given and granted as a donation by the public to the use of said college, as stated in the bill, and that the sum to be subscribed by individuals and corporations was actually subscribed and paid in as required by these Acts, of which subscriptions, it is admitted, complain-

340 MARYLAND REPORTS.

Visitors and Governors of St. John's College *vs*. The State & Governor.

ants' exhibit No. 1 is a copy. It is further admitted that the revenues pledged to the support of this college by the Act of 1784, including as they did nearly all the ordinary sources of revenue now relied on by the Legislature for the support of government, would amount at this day to a quarter of a million of dollars per annum.

Indeed, other proofs are not wanting of the extreme anxiety which Maryland, from the earliest period of her history, has evinced for the establishment upon the most liberal foundation of collegiate and educational institutions within her own borders. At a time when our revolutionary struggle was scarcely ended, when but one year had elapsed from her own accession to the articles of confederation, she passed the Act of April 1782, ch. 8, for founding a college at Chestertown. The preamble of that statute, itself an impressive memorial of her sentiments in connection with the great interests of education, recites, that "former Legislatures of this State had, according to their best abilities, laid a considerable foundation in this good work, in sundry laws for the establishment and encouragement of county schools for the study of Latin, Greek, &c., intending, as their future circumstances might permit, to engraft or raise on the foundation of said schools more extensive seminaries of learning, by erecting one or more colleges or places of universal study, not only in the learned languages, but in philosophy, divinity, law, physic, and other useful and ornamental arts and sciences." It recites further that Kent county school, in the town of Chester, had of late increased greatly by an accession of students and scholars from various parts of the Eastern Shore and the neighboring Delaware State, there being then about one hundred and forty students and scholars, and the number expected soon to increase to at least two hundred; that sundry of the students were preparing and desirous to enter upon a course of philosophy, and must repair to some other State, at a grievous and inconvenient expense to finish their education, unless the Visitors are enabled to enlarge the plan of the said school. The Act then proceeds to incorporate the college by the name of "The Visitors and Governors of

Washington College, in the State of Maryland," who were invested with the most liberal corporate powers, authorised to take and hold lands not exceeding the clear yearly value of £6000, providing against a sectarian character being given to the institution, and exempting the salaries of the professors from all rates and taxes. Again, by the Act of November 1784, ch. 7, a permanent annual grant of £1250 is made for the further encouragement and establishment of Washington College, and certain revenues on the Eastern Shore, now constituting the main reliance of the State for the support of government, were pledged for the security and payment of the donation. By the Act of the same session, ch. 37, St. John's College was established and endowed as already stated, the 33rd sec. whereof, after reciting that in the opinion of the Legislature a connection between the two shores of the State would be rendered more intimate by uniformity of manners and joint efforts for the advancement of literature, under one supreme legislative and visitorial jurisdiction, enact that the said two colleges, viz., Washington College, on the Eastern Shore, and St. John's College, on the Western Shore, should be and were thereby declared one university by the name of the University of Maryland, whereof the Governor of the State for the time being should be Chancellor, and the principal of one of said colleges should be Vice-Chancellor. The Legislature seems to have taken special pains to declare that the said colleges and university should be free to youth of all religious denominations and persuasions, and that no preference should be given to principals or professors on account of their religious professions. The Act of 1785, ch. 5, sec. 3, directs that St. John's College shall always hereafter educate, board and clothe five poor boys of promising genius, to be taken from the counties of the Western Shore, so that each county shall participate in the advantages, and by ch. 39 of the same session, provision is made for consolidating the funds of King William's School in the city of Annapolis with the funds of St. John's College.

The answer further states, that the means thus provided by

the State for an enlarged and liberal system of education within her own borders, failed to realize the beneficient re-sults expected from them.  Neither of said colleges pros-pered or became useful to the people of the State, except in a very limited degree, and the University of Maryland, es-tablished by the union of the two colleges, never, as this de-fendant is informed and believes, went into operation at all. The youth of Maryland were compelled to go abroad to ac-quire a knowledge of the higher branches of learning, and the Legislature, as early as the year 1798, withdrew £500 of the donation granted to Washington College, and in 1805 discontinued the entire donations to that and St. John's Col-lege.  In 1812 the Legislature conceiving that the scheme of a university, formed by the union of these two colleges, had failed of taking effect, and was then at an end, erected a new institution in the city of Baltimore, under the corporate name and style of the University of Maryland.

The answer further states that the Legislature, after with-drawing all donations from these colleges, as before stated, considered, and had good right to consider and believe, that the State became from that time separated from the concerns of said colleges, and in no manner bound to contribute to their support, and that such was also the understanding and belief of these corporations themselves, is apparent from the course pursued afterwards by the colleges towards the State, and reciprocally by the State towards the colleges.   By the Act of 1816, ch. 89, the Legislature, upon the application of Washington College, granted it the right to raise, by lottery, the sum of $30,000, which, by the Act of 1823, ch. 193, was enlarged to $80,000, for the use of that institution.   So also St. John's College was, by the Act of 1821, ch. 46, au-thorized to raise by lottery a sum not exceeding $80,000, and this defendant has been informed and believes that these colleges, respectively, availed themselves of these lottery grants, and received the sums they were thereby authorized to realize therefrom.   That the Visitors and Governors of St. John's College accepted from the Legislature the sum of $1000, granted to them by the Resolution of 1811, No. 38,

and, afterwards, when in 1832 they made another application for aid to the Legislature, it was with the distinct understanding that it should be in full satisfaction of all legal and equitable claims which they might have, or might suppose they had, upon the State, for or by reason of any previous Act or grant of the Legislature in favor of the said college.    Upon these terms, the grant of 1832 was asked by the college; upon these terms it was acceded to by the Legislature.    It therefore formed a new contract between the State and the college, the terms of which were perfectly fair, well understood and regarded as final by both parties.    The sum so granted has been annually paid by the State, and accepted by the complainants "in full satisfaction of all legal and equitable claim which the said Visitors and Governors might have against the State."

The answer further states that the defendant is advised that, while the charter of 1784 may be regarded as a contract between the State and the corporators, which the State could do no act to impair, yet that the grant of money in aid of the objects of the institution was merely *ex gratia*, and might be given or withheld, by the State, at her pleasure; especially after it had became apparent that the college would fail to secure to the people of the State the beneficient results expected from its establishment.    He is, moreover, further advised, that the annual payment of £1750, granted by the Act of 1784, was intended for the endowment of "The University of Maryland," which was created by that Act, and that, inasmuch as the said Act never was carried into effect, by the organization and establishment of this university, the donation which was dependent upon such organization and establishment became itself inoperative and might have been withdrawn immediately, instead of being continued to the year 1805.    If, however, he is wrong in the views here presented, and in the event of its being held by this court that this donation of £1750, did, apart from the charter, constitute a contract which the State, without the assent of the corporators, could not rescind or impair, yet he is advised it was perfectly competent for the parties, by an

agreement between themselves, to change or modify this contract as circumstances might render expedient and just, and he is advised and insists that these corporators and the State did, by agreement, modify and reform the original contract, and that the terms of their new agreement are distinctly set forth and contained in the Resolution of 1832, No. 41. He insists that this resolution was, and was in fact intended to be a compromise and final adjustment of the rights of the college and the liabilities of the State, growing out of the grant of 1784, and the subsequent legislation of the State in reference to the college. That there was no mistake of their rights on the part of said Visitors and Governors, as is alleged in their bill, and this defendant, acting for the State in this behalf, relies upon the said Resolution of 1832 as a final and conclusive settlement of the matter between the parties.

To this answer a general replication was filed by the complainants, and it was agreed that the bill, answer and replication should be presented to the court below, as upon final hearing upon bill, answer and replication, either party to be at liberty to read before that court, or in the Court of Appeals, all such acts, resolutions, reports and proceedings of the Legislature, as counsel may deem pertinent to the case, in the same manner and to the same effect as if the same had been filed as exhibits in the cause, or proved under a commission, or otherwise introduced as evidence; and for the purpose of presenting the questions raised by the Resolution of 1858, fairly to the Court of Appeals, it was agreed that all objection to the jurisdiction of the court should be waived, but this waiver was not to commit the State further or otherwise than is expressed in said Resolution of 1858, the object being to try the case upon its merits without regard to form.

The cause having been thus submitted, the court (BREWER, J.) passed an order dismissing the bill with costs, and from this order the complainants appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*Thos. G. Pratt*, *F. H. Stockett*, and *Alex. Randall*, for the college, after referring to the provisions of the charter, argued:

1st. The third question propounded by the Resolution is whether, if such an instrument of writing, as this charter, had been executed by individual citizens, mutually entering into these distinct stipulations, it would be a contract legally binding upon them? Let us suppose sundry citizens unite in the common purpose of founding and carrying on a school for the education of their children. Some having money contribute cash, to erect the buildings and purchase books; others contribute land as the site; others, having no ready money nor lands, but means to be realized hereafter, set apart these means and assign them to pay salaries of teachers and the expenses of the school as they became due. All agree upon the contributions of each, and legally transfer these respective contributions to trustees, to hold and apply the same to the common object. The land is conveyed, buildings erected, books purchased, the school commences under suitable teachers employed under the contract, but when the salaries are due, the means set apart for their payment are forcibly taken by the contributors out of the hands of the trustees and applied to other purposes, or are withheld when demanded. Here are all the essentials of a valid contract binding upon all the parties. *Powell on Cont.*, 6. 4 *G. & J.*, 1., *Canal Case*. The common transactions of insurance companies, where a party pays down a sum of money in gross for a life annuity is an apt illustration. Would such a company be heard in objecting to pay such an annuity after having received the consideration? The numerous authorities, referred to in the course of this argument, which assume as granted the validity of such a contract as this, render unnecessary any further references on this point.

2nd. The first question propounded by the Resolution is, whether the 19th sec. of this charter which creates this annuity of £1750, constitutes a contract which could not be legally repealed by the Act of 1805, ch. 85? There are fundamental principles of justice acknowledged by govern-

ments and people, so universal in their application, so irresistible in their truth, and so necessary to the well being of civilized society, that they cannot be violated by States or individuals, without shocking the moral sense of all, and being looked upon as utterly inoperative. In the *Regents Case,* 9 *G. & J.,* 408, the court say that independent of the Constitution of the United States and of the State, the Act of 1825, ch. 190, altering the charter of the Regents, was void, "as opposed to the fundamental principles of right and justice inherent in the nature and spirit of the social compact, (in this country at least,) the character and genius of our government, the causes from which they sprang and the purposes for which they were established, that rises above and restrains and sets bounds to the power of legislation, which the Legislature cannot pass without exceeding its rightful authority. It is that principle which protects the life, liberty and property of the citizen from violation by the unjust exercise of legislative power." Justice Story, in 3 *Com. on Cons., sec.* 1393, says: "It seems to be a general principle, fortified by a strong current of judicial opinion, that since the American Revolution, no State government can be presumed to possess the transcendental sovereignty to take away vested rights of property. The fundamental maxims of free government seem to require that the rights of personal property and personal liberty should be held sacred." This case is one far exceeding in its injustice the *Regents' Case.* Can it be tolerated in this enlightened age, that a State, professing to be influenced by the wise and patriotic motives set forth in the preamble to this charter, shall tempt its own citizens, whom it justly describes as *public spirited,* and influenced by a desire to promote the *founding* of a college, to subscribe *considerable amounts of money,* with the promises of legislative *assistance,* and *highly approving* of these generous exertions, and desirous to embrace the favorable occasion for *making lasting* provision for the encouragement of useful knowledge and literature, shall enact this charter, and therein to provide a *permanent fund* for this college, grant an *annuity* of £1750 *forever thereafter,* and when these con-

tributors have paid their money, founded the college and performed all required of them, and have had the college in successful operation, that then the State should withhold its annuity, violate its faith in not *"carrying on"* the institution, and apply the money thus consecrated to this most important purpose to the ordinary exigencies of the government?

Again, this Act of 1805 violates Art. 21 of the Bill of Rights, which declares "that no freeman ought to be taken, or imprisoned, or deprived of his freehold liberties or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land." The word "liberties" here used, is to be applied, with the word "privileges," to such rights as some of the citizens may enjoy by special grants to themselves, or to bodies corporate in which they are interested. *2 Bl. Com.*, 37. *Sullivan's Lec.*, 516. *4 Jac. Law Dic.*, 154. But, be that as it may, this corporation is a mere artificial being; *its* rights, liberties and privileges are, in fact, the rights, liberties and privileges *of some of the citizens,* enjoyed and held through this mere creature of the law, brought into existence for the very purpose to benefit the citizens and the State, and the better to secure their rights and property by holding them in perpetuity. "The property and franchises of a corporation are *private property*, regarded as such by the law, and under the safeguard of the same principle that protects and preserves from legislative violation the property and rights of individuals in their natural character. The law knows no distinction; if one can be invaded, so can the other." 9 *G. & J.*, 409. At page 412 of 9 *G. & J.*, the court apply this 21st Art. of our Bill of Rights to show that the Act of 1825, ch. 190, was void, and so we apply it here to prove that the Act of 1805 is void, as "depriving freemen of their liberties, rights and property, without the judgment of their peers, and against the law of the land."

Another fundamental principle of our government is violated by this Act of 1805. The annuity granted to the college by sec. 19 of the Act of 1784, is the private property of

that corporation. The Act of 1805 takes this private property and appropriates it to the use of the public. This is forbidden by the 5th Art. of the amendments of the Constitution of the United States, and by sec. 46, Art. 3, of the Constitution of this State, which declares "that the Legisla ture shall enact no law authorising private property to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation." Though there was no such inhibition in the former Constitution of Maryland in express words, yet it was comprehended in the rights, privileges and liberties of the common law, secured to the people of Maryland by the 3rd Art. of the Declaration of Rights. This is clearly established by what has been decided in the *Regent's Case*, and by Judge Story in 3 *Story's Com. on Cons.*, sec. 1784. This Act of 1805, therefore, which takes this annuity into the treasury of the State, for the public use, without just compensation, or process of law, violates this fundamental principle of the government and is void.

These various stipulations of the charter are of mutual obligation on all the contracting parties; none can withdraw their separate contribution, nor refuse to comply with their respective stipulations. Having accepted the charter, its grants and franchises, the Visitors and Governors could be compelled by law to continue to hold and execute them accordingly. 1 *Russell & Mylne*, 626, *Attorney General vs. Christ's Hospital*. If a State should make a grant of funds in aid of a corporation, *it has never been supposed* it could revoke them at its pleasure. It would have no remaining authority over the corporation, but that which is judicial, to enforce the proper administration of the trust. 3 *Story's Com. on Cons.*, secs. 1386, 1388.

3rd. The second question submitted by the resolution, is, whether this Act of 1805 is in violation of sec. 10, Art. 1, of the Constitution of the United States, which declares that no State shall pass any law impairing the obligation of contracts? We have endeavored to show that if this charter

had been in the form of a contract entered into between individuals, it would have had all the essentials of a valid contract. If we have succeeded, it would seem necessarily to follow, that so it should be a binding contract if the State be a party, and the instrument assume the form of a charter, because that form does not at all detract from the essential features of a contract, or in any *manner change them;* it rather adds to its force, and by clothing it in the solemn form of a law, gives it a general application and perpetuity, and secures its execution by the plighted faith of the State. "The State can contract with individuals by an act of the Legislature, and its charter granted is a contract not to reassert the rights thereby granted." 4 *G. & J.*, 1, *Canal Case*. The making of an unconditional and fee-simple grant is, of itself, a surrender of all power to assume it by the State. 1 *Curtis' Com., sec.* 242. "It can require no argument to prove that the circumstances of this case constitute a contract. An application is made to the crown for a charter to incorporate a religious and literary institution. In the application, it is stated that large contributions have been made for the objects, which will be conferred on the corporation as soon as it is created. The charter is granted, and, on its faith, the property is conveyed. Surely in this transaction every ingredient of a complete and legitimate contract is to be found." 4 *Wheat.*, 518, *Dartmouth College Case.* "This is plainly a contract, to which the donors, the trustees and the crown, to whose rights and obligations New Hampshire succeeds, were the original parties. It is a contract made on valuable consideration. It is a contract for the security and disposition of property. It is a contract on the faith of which real and personal estate has been conveyed to the corporation. It is, then, a contract within the letter of the Constitution, and within its spirit also." 4 *Wheat*, 643. "Government cannot revoke a grant, even of its own funds, when given to a private person or to a corporation for special uses. It has no more remaining authority, but what is judicial, to enforce the proper administration of the trust, nor is a grant less a contract though no beneficial interest accrue to the possessor,

and the decision in the Dartmouth College case did more than any other single act proceeding from the authority of the United States, to throw an impregnable barrier around all rights and franchises derived from the grant of the government; and to give validity and inviolability to the literary, charitable and commercial institutions of our country." 1 *Kent*, 418. "A charter is deemed a contract, to which the government, the donors, and the trustees of the corporation, are all parties." 3 *Story's Com. on Cons., sec.* 1388. "This charter was for a valuable consideration, for the security and disposition of property, which was entrusted to the corporation upon the faith of its terms, and the trustees acquired rights under it which could not be taken away." 9 *G. & J.*, 365, *Regent's Case.* "That a charter or act of incorporation, when accepted, is a contract, is a proposition too self-evident, and universally assented to, to be drawn in question, or to require the aid of authority or argument; there is no *dictum* opposed to it, to be found in the books." 9 *G. & J.*, 402.

It is worthy of note, that in all the cases referred to, the valuable consideration contributed by the donors was far inferior to that contributed by the donors of this college. But this is not all. In those cases there was no action of the State which forcibly withheld and applied the means of the several corporations to other and different purposes, or paid them into the State Treasury. The State merely transferred the property and franchises of the one corporation to another corporation, to be applied for the accomplishment of the same objects. But here the State actually lays hold of these funds thus appropriated by this charter to the education of her sons, and set apart for that purpose, takes them into the treasury, and applies them to the general purposes of the State.

That this charter is a contract in the sense of sec. 10, Art. 1, of the Constitution of the United States, which the State cannot impair; see, in addition to the authorities already cited, 4 *Wheat.*, 650; 9 *G. & J.*, 404, 405; 3 *Story's Com. on Cons., sec.* 1385.

The fact that there is no power to sue the State cannot change the decision upon the question submitted, whether the Act of 1805 does or not impair the obligation of this contract; for, 1st, no question is submitted by the Resolution, whether or not the contract of 1784 can be enforced against the State ?   Indeed, it proceeds upon the higher and more dignified assumption, that if this court should decide against the constitutionality of the Act of 1805, the State will itself furnish the remedy to correct its own illegal and unconstitutional acts.   This court has said, "it will presume that sovereign States are always ready to do that justice as to claims against them, which would be coerced by judicial process, by a citizen against a citizen."   6 *G. & J.*, 116, *Plater vs. Scott.*   10 *G. & J.*, 225, *Tiernan vs. Rescaniere;* 2nd, this exemption of the State from suit ought not to have any effect upon the character of the contracts protected by this clause of the Constitution of the United States, else the clause would receive its construction, not from the character of the contract, but from the remedy to enforce it, whereas all contracts, whether there be remedy to enforce them or not, are within the words of this clause, and should receive the same construction under it in every court of the United States; 3rd, there may exist a perfect obligation in contracts where there is no known or adequate means to enforce them.   3 *Story's Com. on Cons., sec,* 1375.

Again, the answer rather insinuates than avers, as a defence for the State, that this college has failed to realize the results expected from the means provided by the State.   But we respectfully insist, that the history of the distinguished men, educated at St. John's College, until, by the withdrawal of the State annuity, the only means provided for the payment of the salaries of the professors, these professors could no longer be employed, will clearly show that the college did fulfil all that was expected of her, and we cannot but remark that it surely does not become the State, after failing to execute its part of this contract, and by that failure preventing the college from continuing to realize the sanguine hopes of its founders, to defend itself from the charge of violating its

faith by holding up the very consequences which necessarily flowed from this violation. But if the charge be true, it is no legal defence for the course of the State, for if so the contributors can claim that their money should be returned, if they conceive that their expectations have not been realized, and thus all such corporations may be practically dissolved whenever those who contributed the means to establish them believe they do not gratify their expectations. In all such cases, if the corporation has failed to accomplish the end designed, and a forfeiture of the charter be incurred, the only remedy to the State is to have that issue so decided, and the charter forfeited by a *judicial* tribunal, and no authority exists in the *Legislature* to execute these judicial powers. 4 *G. & J.*, 1, *Canal Case.* 10 *G. & J.*, 356, *Planters Bank vs. Bank of Alexandria.* 9 *G. & J.*, 411, 416, *Regents' Case. Angell & Ames on Corp.*, 266, 510. But if the acts complained of would, in other corporations, be sufficient cause of forfeiture, when legally proceeded against for that purpose, they would have no such effect here, under the 16th and 17th secs. of this charter, which declare that "any matters done and transacted by the corporation contrary to the tenor hereof" (its charter) "shall be null and void," and shall not "be an avoidance or forfeiture of the charter, but that the same shall, notwithstanding, remain unhurt, inviolate and entire," and that the charter shall be construed in all cases most favorably for the college, so as most effectually to answer the valuable ends of the Act of incorporation. See also 9 *G. & J.*, 423.

It is also said, in defence, that the State cannot be sued upon this charter for the annuity, and therefore it is not such a contract as the State is prohibited from passing any law to impair. Though the authorities, before cited, maintain that such State contracts are comprehended in this inhibition of the Constitution of the United States, whether by the laws of the State these contracts are capable of being enforced against the State or not, yet we insist the college has a remedy according to the law in this State. By the terms of the charter the annuity of £1750 is a *perpetual* grant to

be applied to an ever continuing demand.　To provide a permanent fund to raise this annuity, certain taxes are to be levied, as directed by secs. 20, 21, 22, 23, 24, 25 and 32, and are to be paid to the Treasurer, to remain in his hands subject to the order of the Visitors and Governors of the college.　These funds are thus set apart, and by the law *actually appropriated* for the payment of this annuity, *and none of these sections are repealed.*　By sec. 5, the Visitors and Governors may call for and receive from the Treasurer any *money* which may come to his hands for founding and carrying on the college, and by sec. 36, the *balance* only, if any, of the proceeds of these taxes is subject to the disposal of the General Assembly.　Here, then, is not the promise merely of the annuity, not only the plighted faith of the State to pay it, but in fact the actual, absolute, *appropriation,* transfer and assignment of the money.　It is admitted that the Treasurer now has in his hands, of this very fund, ample means to pay this annuity and all its arrearages. It is, therefore, in legal contemplation, remaining in the hands of the Treasurer, subject to the order of the Visitors and Governors, and his duty to pay it is merely *ministerial.*　This then is a case in which the courts will compel its payment by *mandamus.*　4 *Md. Rep.,* 226, 230, *Thomas vs. Owens,* and cases there cited.　9 *Md. Rep.,* 98, *Harwood vs. Marshall.*　12 *Pet.,* 524, *Kendall vs. Stokes.*　12 *Md. Rep.,* 335, *Green vs. Purnell.*

But, it is said, the Legislature may not have power to re peal the charter, but it can repeal the 19th sec., granting this annuity, and a distinction is taken between the repeal of the charter and the repeal of this grant.　Is not this 19th sec. a part of the charter?　If this part can be repealed, why not any other, and why not the whole?　Surely if the chartered franchises of a corporation cannot be taken away by the Legislature, the annuity, without which these franchises would be useless, cannot be so taken away.　In the cases cited, it is conceded the Legislature cannot take away grants of land or property to a corporation, and from that concession is made the deduction, by the courts, that the franchises,

45　　v.15

354       MARYLAND REPORTS.

Visitors & Governors of St John's College *vs.* The State & Governor.

because in the nature of property, cannot be taken away or impaired by the Legislature. Where a law is, in its nature, a contract, and when absolute rights are vested under that contract, a repeal of that law cannot divest these rights. 3 *Story's Com. on Cons.*, sec. 1385. 1 *Curtis Com.*, sec. 253. The government cannot resume its gift, once absolutely made, to a private person, neither can it resume a like gift to a private corporation. It may reserve such a power in express words. 1 *Sumner*, 299, *Allen vs. McKeen.* 3 *Story's Com. on Cons.*, sec. 1371. In 4 *Wheat.*, 598, Judge Story says: "The truth is that the government has no power to revoke a grant, even of its own funds, when given to a private person, or to a corporation, for special uses. It cannot recall its own endowments granted to any hospital, or college, or city, or town, for the use of such corporation. See, also, 15 *B. Munroe*, 642, *Louisville vs. University, &c.* 4 *G. & J.*, 146. 7 *G. & J.*, 7, *Abingdon Academy Case.* 8 *Wheat.*, 1, *Green vs. Biddle.* 2 *Fairfield,* 118, *Trustees of New Gloucester School vs. Bradbury.* 1 *Curtis' Com.*, sec. 239. 6 *Gill*, 288, *Mayor & C. C. of Balto. vs. Balto. & Ohio Railroad Co.* The whole charter is one entire contract, though consisting of various separate stipulations of the different parties, all constituting one complete system, and no part thereof can be altered or superseded by any of the parties. 11 *G. & J.*, 149, *Stansbury vs. Fringer.* 6 *Md. Rep.*, 129, *Gittings vs. Mayhew.* How idle to give the Visitors and Governors the power of appointing a principal, professors and tutors, if the Legislature can deprive them of the means of support by the repeal of the annuity, the only means provided for that purpose in the charter. How idle all the various provisions imposing taxes to pay this annuity, and setting the proceeds of these taxes apart for that purpose, if the Legislature could pass a law repealing the annuity. It is apparent that the right contended for to repeal this annuity, necessarily involves the right to nullify all the important provisions of the charter, and the admission that the charter cannot be changed requires the conclusion that the annuity cannot be repealed.

The defence, that the obligation to pay this annuity was

released, because the University, proposed to be made of the two colleges, by secs. 33, 34 and 35, was never established, cannot avail the State; 1st, because this annuity and all grants by donors, and all the franchises were granted to the college alone, absolutely and independently of this mere potential corporation—the university—which these sections assume may never have any actual existence, and all these grants were' actually vested in the college, and are assumed by the charter to be so vested before the university can have any existence; 2nd, the purpose to be accomplished by the creation of this university was to increase the connection between the two shores of the State, by uniformity of manners and joint efforts for the advancement of literature, not the divesting of the means of the colleges, for which no authority whatever is given in the charter; 3rd, by sec. 34, the by-laws of this university, if it ever shall be created, shall receive the "mutual consent, advice and authority of the two colleges" before they are valid, and then only provided they do not "in any manner abridge or destroy the separate and distinct rights, franchises and immunities of either of said colleges," as granted in their charters.  How strange then, in the absence of any such provision, is the conclusion, that the failure to call into existence this university, which they were not required to create, would forfeit or abridge the rights of the colleges?

The answer appears to rely upon the lottery grant as, in some measure, having relieved the State from its obligation to pay this annuity.  But this grant, however, can have no such effect as to release the State from any of its obligations to the college.  Indeed it rather enforces them by showing that the college stood in need of this aid, and that the State considered it worthy of the assistance thereby granted.   But it is quite sufficient to reply that the State did not claim in any of these acts, granting lotteries to the colleges, that they were intended to release the State from the chartered obligations it was under to them.  They were granted to the colleges as a gratuity, costing the State nothing.   It was certainly not an endowment.  9 *G. & J.*, 397.

But it is said that by the Resolution of 1832, and its acceptance by the Visitors and Governors of the college, all claims against the State, under this charter, are released, no matter how inoperative may be the Act of 1805. In reply to this we purpose to maintain these positions:

1st. That the point here made by the State has not been submitted, by the Resolution of 1858, to the judges for their opinion, and, therefore, will not be considered by them.

2nd. That, as this charter contains no express provision authorizing the State to withdraw or diminish this annuity, or the Visitors and Governors to release it, or any part of it, all such acts of the State, proposing to withdraw or diminish it, and all acts of the Visitors and Governors assenting to them, or purporting to release the State from the payment of the annuity or its arrearages, are inoperative and void.

3rd. That this charter, in its very language, makes this annuity perpetual, and, therefore, incapable of being repealed, and expressly denies to the Visitors and Governors any power to do any act "contrary to the tenor" of the charter, or "in any manner to abridge or destroy its rights, franchises or immunities," and all such acts are declared to be in themselves null and void, and that the charter "*shall be and remain unhurt, inviolate and entire,*" notwithstand- such void acts.

1st. The Legislature of 1858 well knew that the trustees in 1832 found the institution in a languishing condition, for the want of this very annuity which the State had pledged itself forever to contribute, that they believed they were without the means of compelling the State to do them justice, and that they were obliged to submit, from necessity, to the strong arm of the State, and that under these circumstances, in order to preserve to the public some of the benefits of the institution, and relying on the return of wise counsels and just views, on the part of the State, they accepted this small part of their dues, rather than continue to have the whole withheld. We must therefore conclude, that the Legislature, in 1858, rejected all idea of allowing this Resolution of 1832, and the release under it, to stand in the

way of rendering ample justice to the college should the judges decide the questions submitted in its favor. The belief that the acceptance, in 1832, of an annuity of $1667 less than that secured by the charter, and the release to the State, without consideration, of the large amounts of arrearages of this annuity then due, were the effects of compulsion, of mere duress in their needy condition, must have been universal. Such a release, executed too by mere agents, under such circumstances, no court of law would sanction, and any court of equity would set aside. Whatever, therefore, may be the effect of this Resolution and release, the Legislature never intended they should be brought up in judgment against the college in the case now submitted to the judges, and, therefore, it was not among the questions submitted for their opinion. But as it has been urged upon the judges by the counsel for the State, and may be considered within the scope of the questions submitted, we proceed to consider the effect of that resolution and release.

2nd. The argument assumes that the Act of 1805 was void, for the reasons before stated, and that before 1832 there was no pretence of any assent on the part of the Visitors and Governors to that Act, so that there was due them, when the Resolution of 1832 passed, about $100,000 of arrearages, and the annuity of $4667 was, in legal contemplation, continuing. That Resolution then purposed to pay them an annuity of $2000, in addition to the $1000, if they would relinquish the annuity of $4667 and the $100,000 of arrearages. The State having granted this annuity, without reserving any right whatever to recall or withhold it, can have no such power ever thereafter to do so. 1 *Sumner*, 299, 300. 3 *Story's Com. on Cons.*, secs 1385 to 1391. 7 *G. & J.*, 7. 9 *G. & J.*, 365. The very perpetuity of the object to which the annuity was to be applied, required there should be no right to withhold it. The mutuality of the contributions of all other donors required it. The Visitors and Governors are the mere agents for the founders, the State and the public, to accomplish certain specified objects set forth in the charter, by the use of the means thereby placed under their control.

They have not the power to execute any other objects, or to misapply or release these funds from the objects specified, and among their most important duties is to receive this annuity, from the State Treasurer, *forever*, and faithfully apply it to the payment of the salaries of the principal, professors and tutors, which duty they had undertaken to perform, and it would be as much a breach of trust in them to release the payment of any part of it, as to apply it to any other object. There being no authority granted to them to receive less than the whole, or to release the State from the payment of the entire amount, any such acts of theirs would be beyond the scope of their powers, and void. It is a vital principle of a corporate body, that the members can do no act which may destroy or injure its privileges. 9 *G. & J.*, 418. *Angell & Ames on Corp.*, 233, 234, 237. *Grant on Corp.*, 136. Corporations are not only incapable of making contracts which are forbidden by their charter, but in general they can make none which are not necessarily, either directly or indirectly, to effect the objects of their creation. 8 *G. & J.*, 248, *Steam Co. vs. Dandridge.* 1 *Md. Ch. Dec.* 407, *Albert vs. Savings Bank. Ibid.*, 542, *Abbott vs. Steam Packet Co.* But, suppose the trustees to have the visitatorial powers over this corporation, which their corporate name seems to imply, yet are the provisions of the charter quite as obligatory upon them, as where that power exists in any other body. In *Allen vs. McKeen*, 1 *Sumner*, 300, 305, Judge Story, in speaking of this power, says: "Is it a power to revoke the gift, to change its uses, to divest the rights of the parties entitled to the bounty? Certainly not. It is a mere power to control and to arrest abuses, and to enforce a due observance of the statutes, of the charity." "The founder has a right to have the statutes of his foundation as to the powers of the trustees, strictly adhered to, except so far as he has consented to any alteration of them."

3rd. The charter, in its very terms, is made *perpetual*, and its 16th and 34th secs. expressly deny to the Visitors and Governors the power to do any act "contrary to the tenor hereof," or "in any manner to abridge or destroy its rights,

franchises and immunities," and all such acts are declared to be in themselves void, but still it is carefully provided, that the charter "shall be and remain *unhurt, inviolate* and entire," notwithstanding such void acts. The many clauses in the charter which declare it to be "lasting," "permanent," "to be maintained forever," and the words of the grant of this annuity, that it shall be "forever hereafter given and granted as donation to the public," &c., all clearly show that this annuity was never intended to be within the control of the Legislature. The object, too, to which this annuity was to be applied, as stated in the charter, required that it should be perpetual. It was to pay the "salaries of the principal, professors and tutors," whose duties were never to cease, for they were required "to train up *and perpetuate a succession of able men,*" &c. Thus we see the language of this charter was absolute and perpetual; its grants by the donors, the founders, who paid into the Treasury the $32,000, were also absolute and irrevocable, and the great ends and purposes of the charter could be accomplished only by this annuity being perpetual. Now, what would be the effects of this Resolution of 1832 ? 1st. It would reduce that annuity to $3000 instead of $4667, although the charter declares none of these rights, franchises or immunities shall be abridged. 2nd. It would abandon all the arrearages of the annuity, amounting to about $100,000. 3rd. It would leave that annuity under the control of the Visitors and Governors for any purpose they may select, whereas the charter had required it to be paid to the salaries of the principal, professors and tutors. 4th. It would leave this annuity, which the charter had made perpetual, merely temporary, liable to the disposal of the Legislature whenever they chose; even the year after this Resolution of 1832 was passed, and the execution of the release under it, the Legislature might repeal that resolution without doing any violence to its language. It is vain to tell us such an act of gross injustice, after receiving the release, cannot be predicated of such a body as the Legislature of Maryland, when we have in the Act of 1805, and in the very circumstances attending the passage of that resolu-

360 MARYLAND REPORTS.

Visitors & Governors of St. John's College *vs.* The State & Governor.

tion, an instance of the perpetration of this very act of gross injustice. It will be idle to attempt in future to prevent the violation of rights, franchises and property, guaranteed by the provisions of a charter, if this Act of 1805 and Resolution of 1832 can be sustained.

Again, this alteration of the charter is to be made without the assent of the donors, the founders of the college, those who contributed the $32,000 to establish it under the charter at the instance of the Legislature. We have shown by the highest authority that this charter is a contract between these donors, the State and the Visitors and Governors. Surely it requires *all* the parties who made the contract to agree and unite to annul or change its provisions; especially so to change them as to release one of the parties, the State, from the payment of its part of the contract, which was the only means provided in the charter for *carrying on* the college, after the money of the donors had *founded it*, according to the stipulations of the charter. In the contemplated legislative changes of charters, provision is always made for the consent of the stockholders, founders, &c., before such changes take effect. No such assent of the donors or founders is provided for, and none such has ever been given. Acts of Assembly altering the charters of railroad and canal companies require this assent of the stockholders. 10 *G. & J.*, 346, *Planters Bank vs. Bank of Alexandria.* It is worthy of note that this Resolution of 1832 does not require assent to the Act of 1805, nor refer to that Act at all, nor does that Act require any such assent of the Visitors and Governors, nor has it ever, to this day, received any such assent, nor does this resolution refer to any specific claims which they have against the State. It must, therefore, be construed to comprehend only such claims as the Legislature had the power to call upon them to release, and as they had power to release. If there was no power in the Legislature, or the Visitors and Governors, to combine together, to diminish or release this annuity, the court will construe that resolution and release to apply to other claims which may have existed and could legally be so released.

Again, the resolution and release assume that there are claims held by the college against the State. Now, if these claims continued to be held under the charter, then the Act of 1805 is ineffectual to repeal them, and they still existed when the resolution was passed. The effect, therefore, claimed for the resolution is, to change the existing law of 1784, forever appropriating this annuity. In other words, whereas the law of 1784 forever appropriates $4667 to be paid to the Visitors and Governors of this college, "for the payment of the salaries of the principal, professors and tutors" of the college, now this resolution proposes to reduce it to the sum of $3000, to make that sum a mere *temporary* or annual appropriation, and to pay it to the Visitors and Governors, without any limitation or restriction as to its application. Thus then this *Resolution* proposes to repeal the *law*—the charter—in these various provisions. Could it be done under the Constitution of the State as it existed at that time ? We think not. The existing laws of the State can be repealed only by *laws*, passed in the form of laws, under the Constitution: "*Be it enacted by the General Assembly of Maryland*," is the style of all laws, prescribed by Art. 57 of the Constitution. The House in which the laws are to originate, the form they are to assume in passing the Legislature, in being engrossed, how to be certified, signed, sealed, printed and published, are all specially provided for in secs. 10, 11, 57 and 60 of the former Constitution, which sections do not apply to resolutions. Laws never are in the form of resolutions, nor can the repeal of a law assume any such form. The language of laws is, "to enact," "to amend," "to forbid," not "to resolve." "Facts, principles, and their own opinions and purposes, are expressed in the forms of resolutions by Legislatures." *Jefferson's Manual*, 46. In *State vs. Delesdenier*, 7 *Texas*, 94, this distinction between a resolution and a law came before the court for its consideration, though the point was not decided, The assent of the Visitors and Governors, if they had the power to give it, could not confer this power upon the Legislature, or render such a resolution operative to repeal a law of the State,

Suppose a resolution, professing to repeal a part of the criminal code, and to punish the offence differently, could the assent of the party accused of the offence give effect to any such resolution, and authorize the court to punish under it? Consent cannot give jurisdiction is a legal maxim. We conclude, therefore, that if the Legislature had the power to repeal the Act of 1784, or any part of it, it could be effected only by a *law* duly passed, and that this *resolution* is void for any such purpose, and that any release, executed by the Visitors and Governors under it, is also void, even if they had the authority to do so.

We have shown there never was any assent required to the Act of 1805, nor was any pretended to be given to it before the Resolution of 1832. We now propose to show by authority, that the receiving the $2000 given by that resolution and the execution of the release by the Visitors and Governors to the State, and their subsequent release or acquiescence cannot deprive them of the annuity secured by the charter, nor of the arrearages due therefor. The case of *Allen vs. McKeen*, 1 *Sumner*, 277, was like this. In that case it was said that Bowdoin College acquiesced in an Act of the Legislature of Maine, which it afterwards resisted on the ground that the Act violated the Constitution of the United States, by altering the charter of the college and thereby impairing the obligation of the contract. Judge Story says: "I think the argument is not correct; they have merely acquiesced in it— a mere submission to the legislative authority—a course that might be very naturally adopted, to avoid collision with the Legislature, and as a respectful appeal to the future revision of the Act by the Legislature itself. But if this acquiescence could be construed into approval, which, I think, it ought not to be, still that approval cannot give effect to an unconstitutional Act. The Legislature and the Boards are not the only parties in interest upon such constitutional questions. The people have a deep interest in maintaining all the constitutional limitations upon the exercise of legislative powers; and no private arrangements between such parties can supersede them." This decision is approved of in the *Regents'*

*Case,* in 9 *G. & J.,* 419. The court say on this subject, "no acquiescence of any corporation can cure a defect arising from the unconstitutionality of the law." "The most that can be said of it is, that the individual members," (of the old corporation,) "who occupied places under the trustees, wanted situations which they were afraid of losing, and acted alone under that impulse." "It was an unwilling submission only to legislative power and influence, and not an adoption of its act." "It may well be questioned" (say the court at page 416,) "whether, and indeed it is difficult to perceive how, an unconstitutional Act of the Legislature can be made constitutional and valid, by a subsequent acquiescence in it. The whole community have an interest in preserving the constitutional limitations of legislative power. How can the subsequent approval of, or assent to it, give to the Legislature a power which it did not possess at the time it was passed ? and if it cannot, how can it give effect to the Act itself, which was passed without authority?" In each of the cases from which these extracts are taken, there were acts done by the corporations from which there were stronger reasons for concluding that they had assented to, and acquiesced in, the unconstitutional Acts of the Legislature complained of, than in the present case.

Although we cannot conclude this argument without expressing the hope that the questions now submitted to the judges will be so decided as eventually to be the means of restoring to St. John's—this ancient seat of learning—more than its former reputation, and to enable it to realize all the sanguine anticipations of its revolutionary and patriotic founders, and bless our State with an institution of learning co-extensive with her wants, and worthy of her wealth and people, yet we are free to say that there are other questions involved in this decision paramount in importance to these considerations. "One great inducement to these gifts," (founding colleges,) says Ch. J. Marshall, in the *Dartmouth College Case,* 4 *Wheat.,* 647, "is the conviction felt by the giver that the disposition he makes is immutable. It is probable no man ever was, or ever will be, the founder of a col-

364 MARYLAND REPORTS.

Visitors & Governors of St. John's College *vs.* The State & Governor.

lege, believing at the time that an act of incorporation constitutes no security for the institution." Shall this inducement cease ? If so, then will there be a shock to that philanthropic spirit which, in modern times, has founded the Smithsonian Institute, the Peabody Institute, the Agricultural College and other similar institutions, which cannot be too strongly deprecated or too deeply deplored. All property held under chartered rights—all property held under constitutional rights, are, more or less, involved in it. Let it be once tolerated in this State, that an Act and Resolution of the Legislature, such as are here resisted, can be passed, and the State and corporation allowed to execute them, and there will be an end to the security of the millions of property now held under charters in this State, and, what is still more to be deplored, the Constitutions of the State and of the United States will be successfully resisted. The judges, in this case, can have no such anxious apprehensions as those expressed by the courts in the *Dartmouth College* and *Regents' Cases,* in declaring this legislation unconstitutional, because the Legislature itself has voluntarily submitted to them these questions, in order that it may be guided thereby. There is no antagonism here. The State stands ready, as do the other parties—the donors and the Visitors and Governors—to maintain all the provisions of the charter, deeply interested in the faithful execution of them all, in order to accomplish its declared object: "The liberal education of youth in the principles of virtue, knowledge and useful literature, as the highest benefit to society "

*Wm. Price* for the State:

That a State can pass no law impairing the obligation of a contract, no one will deny. That the *charter* of St. John's College is a contract which the State could not impair, is also freely admitted, but that the *donation* of £1750, made by the Act of 1784, is a contract which could not be impaired, and that the State, having once granted the annuity, is bound to pay it annually forever, is altogether denied.

The distinction between the *charter* and the *donation* is a very plain one, as I shall show.

The case is simply this: the State guaranteed £1750 to the College, to be paid by the State annually forever; suppose she refuses, how is she to be compelled to pay? The whole case lies in this one question. The donation, under the circumstances, might be binding upon an individual, but how can that be binding upon the State which cannot be enforced against the State? You cannot impair an obligation where there is no obligation to impair. It is for the very reason that the State cannot be sued, and the contract enforced against her, that the inhibition of the Federal Constitution cannot apply to the case. For when it is said that a State shall pass no law impairing the obligation of a contract, a contract of perfect or legal obligation must be intended. But the promise to pay this £1750 annuity was merely *ex gratia.* It must have been so considered on all sides, because it was known from the first that if the State should afterwards choose not to pay, there was no power any where to compel her to pay. It was what ethical writers call a promise of imperfect obligation—a promise which the party making may respect or not, as he pleases.

The State cannot be sued because she is a sovereign. 2 *Eng. Eccl. Rep.,* 112. It may be asked, why is a charter such a contract as the State may not impair, and a promise of the State to pay an annuity such an undertaking as it may impair? The answer has already been given. The State can be compelled to perform the one while she cannot be compelled to perform the other. A charter operates to vest the franchise in the corporators and their successors, and if the State shall attempt to repeal the charter, the courts lay their hands upon the repealing law and declare it void. The result of which is, that the corporators remain in quiet possession of their chartered privileges, and in this way the State is compelled to perform her contract implied in the granting of the charter. She is compelled by the simple process of staying her hands, when she would resume the rights granted by the charter. But in regard to a grant of

money by the State, and especially a grant of an annual payment by her, if she refuses, how is the promise to be enforced? The act of compulsion implies a power to coerce, first, the Legislature to levy the tax, next, to collect it from the people, next, to bring it into the treasury, and last of all to pass the appropriation to pay it out. The refusal to perform any one of these steps in the process defeats the donation. And suppose there is a refusal *in toto*, what are you to do? The answer is, you can do nothing. You cannot sue the State, and get a judgment, and if you could, what are you to do with the judgment? This view of the subject is so obvious and so conclusive, that I scarcely deem it necessary to refer to authorities to support it. If authority should be wanting, I may refer to 3 *Story's Com. on Cons., sec.* 1374, where it is said, "that when the obligation of contracts is spoken of in the Constitution, we are to understand not the mere moral but the legal obligation of contracts. The moral obligation of contracts is, so far as human society is concerned, of an imperfect kind, which the parties are left free to obey or not, as they please." The injury which a law impairing the obligation of a contract inflicts, is, in preventing the party from resorting to the law for the recovery of his rights. If, then, it be a case in which the law affords him no remedy, he is not injured—his contract is not impaired.

It must not be understood, however, that in relieving the State from the legal, I have intended to place her under a moral obligation to pay this money, and there to leave her. Far from it. If she is morally bound to pay the annuity, I say, for one, let her pay it. Her good faith—her honor—is too sacred to be compromised for money, large though the sum may be. I am to show, therefore, and I do it as a matter of duty, that the State is under no obligation of any kind, legal or moral, perfect or imperfect, to pay this annual donation. This college has no claim upon her, legal, moral or equitable. The promise of the State, originally, was upon conditions which have never been performed. That promise, if put into words, would read thus: "I give you this money, that with it you may establish a university which shall for-

ever hereafter be renowned for the science, the scholarship, and the literary distinction of its appointments; it shall be a seat of learning in which degrees shall be conferred in any of the faculties, arts and sciences, and liberal professions, to which persons are usually admitted in other colleges or universities in America or Europe. The Governor of the State shall be the chancellor of the institution, to seal the diplomas and give dignity to the degrees of the graduates. I give you this annuity, and allow you to hold estates of the annual value of £9000 or $24,000, besides, in order if you fail to realize the design of your institution, the want of means shall not be alleged as the excuse for such failure." These were the stipulations distinctly announced in the charter as forming the conditions of the grant of this annuity. The money was paid from 1784 to 1805, a period of twenty-one years, upon these conditions, and yet not one of them ever was performed. No university was established—the Governor never sat as chancellor. The youth of Maryland have been compelled to go abroad for those means of obtaining an accomplished education which, from the munificence of their own State, they were entitled to expect at home. The Legislature made ample provision for the endowment of a college of the first class. The State surrendered her own revenues to accomplish an object which she had so much at heart, and received nothing in return but disappointment. The wonder is, that she paid up as long as she did. Certainly, in view of such a history as this, it cannot be said that she has acted in bad faith. If the conditions upon which the donation was made had been performed, the donation would have been continued, but as they were not performed it was withdrawn. This was right and just, and no one can have good cause to complain against her. Massachusetts has *her* university. All her youth are now, and have been for a century, educated at Harvard. Her public men, her professional men, her literary men, and her leading mercantile men, were school-fellows and class-mates, and, it may be, room-mates and bed-fellows, when they were boys. They grew up together like members of the same family. If a candidate is proposed for office

in Massachusetts, there are men who know him intimately throughout the State. They have measured and guaged him, and know his stature and his calibre. If a man is required for any special public duty, the whole State knows where to find him—the very man to suit the position can be named at once. New Hampshire has *her* university, with the same beneficial results flowing from it. Connecticut has *hers*. Virginia has *her* university, which is of a date more recent than the others, but in time her educated classes will be bound and cemented together by the same ties and recollections as in Massachusetts. Maryland strove hard to secure to her people the same privileges and blessings, but was disappointed. She was willing to pay for them—did pay for them—but failed to realize them. Is she to pay for them over again and still not have them? She would be willing, no doubt, to pay for them now, if she could only get them when paid for. I think it very clear, therefore, that the State, being under no legal obligation to pay this annuity, was equally free from any obligation, in morals or conscience, to pay it.

But suppose she was both legally and morally bound to pay; suppose she had given her bond, under her great seal, for the whole amount, then I say she has settled and compensated, and paid to the last dollar, which the college had the slightest claim or right to ask from her. I will succinctly retrace the facts. In 1798 the Legislature withdrew £500 of the £1250 granted to Washington College, and, in 1805, discontinued the entire donation to that and St. John's College. The State had given St. John's College a fair trial of twenty-one years, during which time she regularly paid every year this £1750 or $4666.66⅔. But finding this large expenditure to be wholly without results, and that the whole scheme was a failure, she stopped her payment entirely, and refused to pay any more. This she did in 1805. In 1811 we find St. John's College knocking at the doors of the Legislature, and by a resolution of that year, (No. 38,) a grant of the annual sum of $1000 was made to the college, and that sum from that time forth was regularly paid to its visitors and governors. If we were to stop here, we might say this grant looked very

DECEMBER TERM, 1859. 369

Visitors & Governors of St. John's College *vs.* The State & Governor.

much like a compromise. For why only $1000? It is fair to presume that the State would not agree to give more, and that the college agreed to accept it, and to ask no more. In 1812 the State, as if she had abandoned all hope of any beneficial results from a university by the union of St. John's and Washington Colleges, established a new university of Maryland, to be erected in the city of Baltimore, an institution about as barren of results even as St. John's College itself. In 1816 a lottery was granted to Washington College to raise the sum of $30,000, which, in 1833, was enlarged to $80,000. By the Act of 1821, ch. 46, a lottery was granted to St. John's College to raise $80,000. But it was in 1832 that St. John's College made her final demand upon the Legislature. By Resolution of that year, (No. 41,) the annual sum of $2000 in addition to the $1000 of 1811, and in addition to the authority to raise $80,000 by lottery, was granted to the visitors and governors of that institution. But the grant was made upon the express proviso that the said sum should be *accepted in full satisfaction of all legal or equitable claim* which the visitors and governors might have or be supposed to have against the State, and it was further provided that before they received this annuity, they should *file their acceptance* of the same, *upon the terms and conditions specified*, in the office of the clerk of the Court of Appeals of the Western Shore, to be recorded in his office. That *acceptance* was filed, and after reading it, it must seem strange to any one to find this college renewing her demand against the State, and asking for more money. Here she is, however, and her demands are larger than ever. The Resolutions of 1832 made another condition with the college, as an additional condition of the grant of the annuity. They required that the charter of the college should be so amended as to give the State a representation in the Board of Visitors and Governors, and that the Governor, the President of the Senate and Speaker of the House of Delegates, and the Judges of the Court of Appeals, for the time being, should be members of the Board. Accordingly, at a meeting of the Board, held on the 4th of March 1833, the Resolutions having been

read and considered, it was declared that in consideration of the grant of the annuity aforesaid, the visitors and governors of St. John's College did agree to the proposed amendment of their charter, and did accept of the said annuity in full satisfaction of all legal or equitable claims which the said visitors and governors had against the State. The proceedings of the Board were authenticated under the common seal of the college, and the proceedings filed in the office of the clerk of the Court of Appeals for the Western Shore, as required by the Resolution. These proceedings of the Board show not a compromise merely, but a final accommodation and settlement of all matters in dispute, if there was any dispute in the case. It was a payment of all demands and a receipt in full. If the college had a legal claim upon the State, as she had not, this settlement and release was binding, and it ought to be binding, for without the stipulation that there were to be no further demands, the grant never would have been made. It is well settled that a compromise will be sustained and the terms enforced as between the parties, unless it appear that the party seeking to be released from it was incapable of understanding, or was so overreached as to make it unconscionable in the other party to claim the benefit of it. 15 *Verm.,* 379, *Paris vs. Dexter.* 7 *H. & J.*, 468, *Bosley vs. M'Kim.* It is to meet this aspect of the case that the bill avers and charges that the annuity of 1832 was accepted by the visitors and governors "in ignorance of their rights, through oversight or otherwise through misapprehension and mistaken construction of the powers, liabilities and franchises in their charter." It is not sufficient merely to *allege* ignorance, misapprehension and mistake, but when these allegations are made the ground of setting aside solemn instruments, they must be proved, and what is the proof in the case? Not a syllable that looks like proof. On the contrary, the facts show anything but mistake or misapprehension of rights. It will not be overlooked, moreover, that it is a learned college which comes into court alleging ignorance and misapprehension. It is a fact not less impressive, that the misapprehension occurred in 1833, twenty-six years ago, and that the col-

lege, during that entire interval, has been receiving its annual payment of $3000 from the treasury, in addition to the sums in gross realized from their lottery grant. Such an acquiescence would cure both mistake and ignorance; nay, it would be sufficient to prevent the allegation of fraud which is not pretended here. 4 *Bibb.*, 529, *Weist vs. Yoder.*

Upon the whole, it is very clear that there never was a contract, in the sense of the Constitution, between the State and the college; that the original undertaking of the State was upon conditions which were not performed, by which the State became exonerated from all moral obligation to continue the annuity. It is plain, moreover, as I think, that the Legislature has acted with great liberality towards this institution; that a full, fair and final settlement was made between the parties, and that the same ought not to be disturbed. Whether the Legislature of Maryland may, at any time hereafter, feel disposed to renew the effort to found a university of her own, within her own limits, and, if so, whether the State would be inclined to select Annapolis as the site of the institution, are questions which do not come within the legitimate scope of the present discussion, and I forbear to enter upon them. It will not, however, be out of place to remark, in conclusion, that a more eligible or a more beautiful foundation for such a college, could not be found anywhere than that occupied by St. John's College at Annapolis.

Le Grand, C. J., delivered the opinion of this court.

This case originates out of a Resolution, No. 4, passed by the General Assembly of Maryland, at its session of 1858.

The questions in relation to which the opinion of the Judges of the Court of Appeals is desired, are:

1st. Whether the annual appropriation, made by the 19th section of the Act of 1784, ch. 37, of the sum of seventeen hundred and fifty pounds, current money, to be applied to the payment of salaries, &c., constitutes a *contract* on the part of the State, *under all the circumstances of the case*, which could not be legally repealed by the Act of 1805, ch. 85 ?

2nd. Whether this latter Act is not in violation of the tenth section of the first Article of the Constitution of the United States, which declares, that no State shall pass any law impairing the obligation of contracts?

3rd. Whether the former Act, with the circumstances of the case, constituted such a contract as would, if entered into between individual citizens, be legally binding upon them?

These questions necessarily resolve themselves into but one, and that, the first of the series. For, if the Act of 1784, ch. 37, created a valid and binding contract, it cannot be denied, and has not been in the argument of the cause, that it was incompetent to the Legislature to annul or alter it without the consent of the grantees.

We understand the language of the Resolution, as confining our attention exclusively to terms of the Acts of 1784, ch. 37, and 1805, ch. 85, and the circumstances connected with their passage, and so understanding its purport, we shall omit all notice of circumstances occurring subsequently. The record presents other questions, which, in an ordinary case, we might deem it proper to consider; but this case is, *sui generis,* unlike an ordinary suit. The proceedings have been instituted under the authority of the Legislature, for the sole purpose of obtaining the opinion of the judges of this court upon certain specific questions propounded by the Resolution, and we, therefore, consider it proper to confine ourselves to those questions.

The State, on application of certain public-spirited citizens, granted the charter of St. John's College, and the preamble to the Act for founding the college sets out fully the motives of both parties. It states that, "it appears to this General Assembly, that many public spirited individuals, from an earnest desire to promote the founding a college or seminary of learning on the Western Shore of this State, *have subscribed and procured subscriptions,* to a considerable amount, and there is reason to believe that very large additions will be obtained to the same, throughout the different counties of the said Shore, if they were made capable, in law, to receive and apply the same towards founding and carrying on a col-

DECEMBER TERM, 1859. 373

Visitors & Governors of St. John's College *vs.* The State & Governor.

lege or general seminary of learning, with such salutary plan, and with such legislative assistance and direction, as the General Assembly might think fit, and this General Assembly, highly approving those generous exertions of individuals, are desirous to embrace the present favorable occasion of peace and prosperity, for making lasting provision for the encouragement and advancement of all useful knowledge and literature, through every part of the State." The third section of the Act constituted certain persons agents *"for soliciting and receiving"* subscriptions to the college; and the *nineteenth* section, "to provide a permanent fund for the further encouragement and establishment of the said college," enacted, *" That the sum of one thousand, seven hundred and fifty pounds, current money, be annually and forever hereafter given and granted, as a donation by the public, to the use of the said college,"* &c.

By the first section of the Act of 1805, ch. 85, this donation was discontinued and ordered to remain in the Treasury, subject to the appropriation of the Legislature to literary purposes, and for disseminating learning in the several counties of the State.

It is admitted, on behalf of the State, that individuals and corporations did, of their own funds, contribute towards the founding of the college, the sum of *thirty-two thousand dollars.*

Confining ourselves to this state of case, the simple question is: was the Act of 1784, *under the circumstances*, a *contract* within the meaning of the 10th section of the first Article of the Constitution of the United States?

By the fifth Article of the Constitution of the United States, it is expressly provided, that the *" Constitution, &c., &c.,* shall be the *supreme law* of the land, and the judges in every State shall be bound thereby, *anything in the Constitution or laws of any State to the contrary notwithstanding;"* and, by the 2nd section of the 3rd Article, that, "the judicial power shall extend to *all* cases in law and equity arising under this Constitution," &c.

This being so, the duty of this court is plain. It is to

374 MARYLAND REPORTS.

Visitors & Governors of St John's College *vs.* The State & Governor.

ascertain whether, under the decisions of the Supreme Court of the United States, the Act of 1784, ch. 37, is a contract which the Legislature could not impair or annul. That it was such, on the principles laid down by the Supreme Court in its interpretation of the meaning of the word *"contract,"* as used in the 10th section of the first Article of the Constitution, in our judgment, ought not to admit of a doubt. We content ourselves with a citation of some of the language employed by the highest tribunal known to the country.

The leading and controlling case on this subject is that of *Dartmouth College vs. Woodward,* reported in the 4th volume of *Wheaton,* commencing at page 518. This case was argued at great length and with rare ability. The judgment pronounced in it, has been the settled law of the land ever since. In that case, the charter of the college had been granted by the crown in the year 1769. Subsequently, the State of New Hampshire, passed certain Acts, whereby the charter was altered, principally by increasing the number, and altering the mode of the *appointment,* of trustees, and creating a board of overseers. This was done without the assent of the corporation.

On such a case, *Chief Justice Marshall,* in delivering the opinion of the court, said: "It can require no argument to prove that the circumstances of this case constitute a contract. An application is made to the crown for a charter to incorporate a religious and literary institution. In the application, it is stated, that large contributions have been made for the object, which will be conferred on the corporation as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. *Surely, in this transaction, every ingredient of a complete and legitimate contract is to be found."* Having determined that the charter was a contract, in the broad sense of that term, he proceeds to inquire, whether it be *such* a contract as *is protected by the* Constitution? He distinguishes between *private* and *public* corporations, and says: "If the Act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the

funds of the college be public property, or if the State of New Hampshire, as a government, be alone interested in its transactions, the subject is one on which the Legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution.'' He demonstrates by a course of cogent reasoning, that the grant of the crown was not one of political power, merely to be exerted for governmental purposes, and gives several illustrations of the difference between a public and a private corporation. *Mr. Justice Story*, in his opinion, in the same case, goes so far as to remark: ''A private donation vested in a trustee for objects of a general nature, does not therefore become a public trust, which the government may, at its pleasure, take from the trustee and administer in its own way. The truth is, that the government has no power to revoke a grant, even of its own funds, when given to a private person, or corporation for special uses.''

The doctrines laid down by the Supreme Court have been repeatedly recognized and asserted by the courts of this country, as well in this as in other States. Until overruled by the same tribunal which announced them, they are the law of the land. It is useless, therefore, to cite from elementary writers and adjudged cases, evidences of their affirmation. In response, therefore, to the questions propounded by the Resolution to the Court of Appeals, we give it as the opinion of that court:

*First.*—That the annual appropriation made by the 19th section of the Act of 1784, ch. 37, of the sum of seventeen hundred and fifty pounds, current money, to be applied to the payment of salaries, &c., constitutes, under all the circumstances of the case, a contract on the part of the State, which could not be legally repealed by the Act of 1805, ch. 85.

*Second.*—That the Act of 1805, ch. 85, was a violation of the tenth section of the first Article of the Constitution of the United States, which declares, that no State shall pass any law impairing the obligation of contracts.

*Third.*—That the Act of 1784, ch. 37, with the circum-

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

stances of the case, constitutes such a contract as would, if entered into between individual citizens, be legally binding upon them.

And so the judges of the Court of Appeals certify. Witness their signatures:

> Jno. C. Le Grand.
> John B. Eccleston.
> Will. H. Tuck.
> Jas. L. Bartol.

(Decided February 7th, 1860.)