Mr. Justice Hagner
delivered the opinion of the court:
The case is one of great importance, as well by reason of the amount claimed as because of the numerous and interesting questions involved. These have been argued with great .ability, and they have received the careful consideration their importance demanded.
The action was commenced in November, 1875, in the name of the District of Columbia against the Washington Market Company. The declaration contained two special counts, and the usual money counts for money payable, &c. In the first count the pleader undertakes to set out the four *563 teenth section of the act of Congress of 1870, incorporating the market company. With this declaration was tiled a bill of particulars claiming a balance due the District of over $53,000.
In January, 1876, the defendant filed a general plea of not indebted, and in April following a special plea in the following words :
“And for a further plea, the defendant says that subsequent to the passage of said act of Congress of the 20th of May, 1870, that is to say, on the 3d day of March, 1873, the Congress of the United States passed a further act, appropriating such sum for the purchase by the United States of the interest of the District of Columbia in the city-hall buildings in Washington, then used solely for government purposes, as might be determined by three impartial appraisers, to be selected by the Secretary of the Interior, not exceeding seventy-five thousand dollars, the same to be applied by said District only for the erection of a suitable building for the District offices ; and in and by said act the Governor and Board of Public Works of the said District were authorized, if they deemed it advisable for the purpose of the erection of such building, to make arrangements to secure sufficient land fronting on Pennsylvania and Louisiana avenues between Seventh and Ninth streets, which land so authorized by said act to be procured was a portion of the land granted to the defendant company by said act of May 20, 1870, in consideration of which said sum of twenty-five thousand dollars was to be paid annually to said city of Washington; that subsequently, that is to say, on the 18th day of March, 1873, in pursuance of said act of Congress of March 3, 1873, an agreement was entered into by said District of Columbia, represented by said Governor and Board of Public Works, with said defendant company, by which, among other things, said company agreed that it would by quitclaim deed release and convey to said District, for the purpose of the erection of said District building thereon, all the right, title, and interest of said company acquired under said act of May 20, 1870, in and to so much *564 of the laud described in said act, and fronting on Pennsylvania and Louisiana avenues between Seventh and Ninth streets, as was described in said agreement, being a piece of eigbty- . six feet in depth along said avenues and between said streets; and said defendant company also agreed to-convey to said District the right to use in common with said company, as a passage-way and court-yard, all the lapd between the said land so to be released and conveyed as aforesaid and a line drawn from Seventh to Ninth street, ten feet north of the Seventh and Ninth street buildings of said market company; that in and by said agreement the said District of Columbia, among other things, in consideration of the aforesaid r'elease and conveyance by said defendant company, agreed with said company that said District would assume and fulfill all obligations imposed upon said company by section 14 of said act of May 20, 1870, (as modified by an act of the Legislative Assembly of the District of August 23, 1871,) except as follows : That the market company should pay annually to the District, during the term and for the purpose mentioned in said section 14, the sum of seven thousand five hundred dollars, payable quarterly, which sum should, during said term, be in the place of all rental for the ground occupied by the market buildings of said company; and that in case in any year the general District taxes upon said ground and market buildings should exceed five thousand five hundred dollars, the excess above that amount should be deducted from said rental of seven thousand five hundred dollars, so that the total annual payments for rental and taxes should not exceed thirteen thousand dollars; that it was also provided in said agreement that possession of the land conveyed should be given the District upon the day of executing said agreement; that said agreement should take effect April 1, 1873, and that the defendant company should at once settle its past-rental account to said April 1, at the rate after August 23, 1871, fixed by the resolution of the Legislative Assembly of that date, and should immediately pay the balance due to the treasurer of said District; that in pursuance of said agree *565 ment of March 18, 1873, said defendant company, by deed of release of that date, conveyed to said District all said company’s interest in said land and privileges as in and by said agreement was required, which said deed was duly accepted by said District and recorded, possession of said land was delivered to and taken by said District, and the work of erecting said District building commenced by said District, and possession of said land has ever since been and now is retained by said District; that the value of the interest of the District in said city-hall building having been determined by appraisers selected by the Secretary of the Interior, under said act of March, 1873, at seventy-live thousand dollars, said sum was duly paid by the United States to the District, was accepted by the District Legislature, and said Legislature, by act of June 26,1873, appropriated said sum and fifteen thousand dollars in addition, making ninety thousand dollars in all, to h.e drawn by the Board of Public Works for the erectioil of said building for District offices, from which appropriation payments were made for the work of erecting said building on said land as aforesaid; that under the aforesaid act of May 20, 1870, there was granted to said defendant company all the land fronting Pennsylvania and Louisiana avenues between Seventh and Ninth streets, and extending southerly to the middle of B street, before that time known as reservation 7 or Centre Market space, with the provision that on the rear of said grounds should be erected public market buildings, and that on the front grounds should be erected a building to be rented by said company for stores, offices, and other lawful purposes, to be determined by said company; that prior to said agreement of March 18,1873, said market buildings were duly erected and opened and occupied as required by said act of May 20, 1870; that said front grounds were valuable to said company for the purpose of erecting said building for rental as aforesaid, and its rights therein were released and conveyed to said District only at the solicitation of the District officers, in pursuance of said act of March 3, 1873, and in consideration of said agreement by said District *566 to assume and fulfill all obligations imposed upon said company by said section 14 of said act, except the payment by said company of said annual sum of $7,500; that immediately upon the execution of said agreement of March 18,1873, said defendant company settled its past rental account and paid all amounts due to said date, and that since said date said company has duly paid to said District said sum of $7,500 annually, as required by said agreement.
“’Wherefore, and by reason of all which the premises, the defendant says that the plaintiff ought not to be admitted to say as in declaring said plaintiff has alleged.”
The plaintiff filed a demurrer to this special plea, and a ■note of the matters of law intended to be argued under it, as follows:
“ 1. That the act of the Legislative Assembly in said plea mentioned does not reduce the annual rental required by act of Congress to be paid by the defendant.
“2. That the Legislative Assembly had no authority to so reduce said annual rental.
“3. The defendant did not and could not make a valid conveyance of the land alleged in said plea to have been conveyed by the defendant to the plaintiff; said land being held by the defendant under a statutory lease from the United States, and subject to certain trusts. «
“4. Neither the Board of Public Works nor the District of Columbia was authorized by the act of March 3, 1873, in said plea mentioned, to buy the land alleged in the plea to have been bought from the defendant, the reversion of said laud being in the United States.”
The scope of the argument extended beyond these four causes, and as the parties evidently desire a decision upon all the points raised, we propose to examine them in their due order.
First. Did Congress possess the constitutional power to reduce the l’ent exacted by section 14 of the act of 1870 ?
It is important to consider the situation of this property when this act was passed. This reservation then belonged *567 exclusively to the United States. According to the decision in Van Ness v. City of Washington, 4 Peters, the United States possessed it free of all trusts, untranuneled by all conditions, with the right to do with it whatever any private proprietor in the city could do with his land, or whatever the United States could do with any other government lands. It could; therefore, have sold it and placed the proceeds in the public treasury. It could have given it away absolutely, as it has given away millions of acres to railroads, to meritorious officers and soldiers, or to any charitable object. As a matter of course, therefore, it could lease it, reserving such annual rent as it should see fit to claim, from $100,000 to $25,000,. or for a consideration as insignificant as the two Indian arr rows — the price of the grant of Maryland from Charles II. It could make that rent payable either directly into the treas■ury, or to a private individual, or to an appointee for the use of any beneficiary it might select, as it did in this case. It cannot be denied that if the rent had been reserved, payable directly into the treasury, Congress might afterwards have reduced or released it, as a private person might release a rent payable to himself. Does the fact that by the act of Congress itself the market company was directed to pay the money to the city of Washington, remove the rent beyond control of the power that created it ?
It must be admitted that the reservation of the rent to the city was a mere gratuity on the part of Congress towards this municipality, bestowed without the slightest consideration moving from the city to the United States — as purely a bounty as were any of the royal grants to the colonial territories by the “ special grace, certain knowledge, and mere motion ” of the English kings; and it is well settled that bounties are within legislative control, and always subject to be withdrawn by the power that conferred them. Of this character are the pensions granted by Congress, or appropriations for charities, which are subject at all times to be withdrawn by the sovereign, however severely such withdrawal might operate upon individuals. By law, goods seized for violations *568 of the customs duties are liable to forfeiture ; and to stimulate vigilance on the part of the revenue officers, a valuable part of the forfeiture is assigned to them. But as the Secretary of the Treasury is authorized, in his discretion, to remit the penalty, the Supreme Court has held that his remission also releases the share of the collector; and that there can be no such vested right in him as to his moiety as may not be fully destroyed by the act to the government.
An illustration of this principle, as affecting individuals, is afforded by the decision in Salt Co. v. East Saginaw, 13 Wall., 373.
But there is a special reason why this right to destroy or diminish a gratuity applies where a municipality is concerned.
A city is one of the public territorial divisions of the country, established for public political purposes connected with the administration of the government. It is one of the instruments of government, invested with local jurisdiction to aid in the administration of public affairs. Such a municipality is always the subject of legislative control as to its duration, powers, rights, and property. In a public capacity onty could it receive this money, to be used by it for public purposes only. From numerous eases at hand, uniformly maintaining this proposition, I will refer to a decision in Maryland, of Hagerstown v. Sherer, 37 Md., 180.
In this case the court, in discussing this subject, say:
“ The case of The State, use of Washington county, v. B. & O. R. R. Co., 12 G. & J., 299, is a very instructive one as to the power the Legislature may exercise over the supposed rights of such corporations. The Legislature, in an act to promote internal improvements, had inserted a proviso, that if the railroad company did not locate their road so as to pass through Hagerstown, they should forfeit $1,000,000 to the State, for the use of Washington county. The compaity failed to make the designated location, and suit was then brought against them in the name of the State, for the use of the county, to recover this sum. The Legislature then passed an act releasing this forfeiture. The validity of this latter act was *569 assailed, but was sustained by the court. * * * In that part of their opinion where they treat the ease as one of contract and not of penalty, they say, in this view of the case, ‘it is material to consider who are the contracting parties, and in what relation does the cestui que. use stand to the legal plaintiff on the record. The contracting parties are the State on the one part and the railroad company on the other. The considerations of the contract were the franchises and privileges derived by the company from the State, and the cestui que use is one of the counties of the State, claiming an interest, incidentally, in her political character and capacity, in virtue of one of the provisions contained in that contract’
“The State, for reasons which she deemed sufficient, has thought proper, by an act of her Legislature, to annul the contract and release the claim of the cestui que use, which this action has been instituted to enforce. In doing so the Legislature have not transcended their constitutional limits. Washington county, by which the claim is intended to be enforced, is one of the public territorial divisions of the State, established for public purposes connected with the administration of the government. In this character she would receive the money as public property, to be used for public purposes only, and not for the use of her citizens in their private characters and capacities. In that relation they would have no immediate interest and could assert no title. * * * If, then, it be public and not private property, it would seem to be completely at the disposal of the government, and the act of 1840 was nothing more than a rightful exercise of legislative power.”
This judgment -was affirmed by the Supreme Court in 3 Howard, 534, where it was held,.that by the repealing act the Legislature had dealt altogether -with matters of public concern, and had interfered with no private right, because neither the county commissioners nor the county, nor any one of its citizens, had acquired any separate or private interest in this money -which could be maintained in a court of justice.
*570 If further countenance for the exercise of the right were needed, it might be gathered from the provision in section 17 of the charter of the market company, reserving the right of Congress to legislate in respect to said property, and from the opiuion of the Supreme Court in Welch v. City Collector, not yet reported.
We have, therefore, no doubt that Congress did possess the power to reduce the rental. It must be admitted that it was not essential that this reduction should be made by an ad of Congress and by explicit words. Congress might equally accomplish the end by authorizing the District of Columbia, the successor of the city government, to release or reduce the rents, and this power might be confided to them by general loords large enough to comprehend the powers, though not explicitly describing it. (Welch v. City Collector, supra.)
Second. The question then arises: Did Congress confer such authority upon the District government ?
It is claimed on the part of the market company that the authority is given to the District government by the act of Congress of March 3, 1873, while the counsel for the District insists that this act confers no such authority.
The language of the section applicable to this point is as follows:
“For the purchase by the United States of the interest of the District of Columbia in the present city-hall building in Washington, now used solely for government purposes, such sum as may be determined by three impartial appraisers, to be selected by the Secretary of the Interior, not exceeding $75,000, the same to be applied by the said District only for the erection of a suitable building for the District offices; and the Governor and Board of Public Works are authorized, if they deem it advisable for that purpose, to make arrangements to secure sufficient laud fronting on Pennsylvania and Louisiana avenues between Seventh and Ninth streets: Provided, That the Government of the United States shall not be liable for any expenditures for said land, or for the purchase-money therefor, or for the buildings to be erected there *571 on; and no land, or the use thereof, is hereby granted for the purpose of erecting any building thereon for such building.” (17 Stats., 540.)
It has been insisted in the argument that the court, with a view to a clearer understanding of the language used in the section, is at liberty to consult the record of the debates in the houses of Congress while this section was under discussion. It is true that the courts, in the examination of certain constitutional questions, have at times referred to the essays in “The Federalist” written by the great founders of the instrument., contemporaneously with its submission to the people, and have cited the opinions of those eminent men in support of their conclusions. It is also true that in New York and in some other States it has been considered proper to examine the journals of the Legislature to ascertain whether a particular measure received the two-thirds vote required by the State Constitution for that class of laws. But we have seen no authority that would justify us in appealing to so uncertain a source for guidance as the remai’ks of members in debate. It is well known that a measure is sometimes advocated by a person upon grounds which another may assign as the cause of his opposition; and in this case there- can be no more striking proof of the fallacious character of such evidence than the fact that both sides refer to different portions of the same debate in support of their respective views.
If reference were to be had to any portion of “ The Congressional Record,” it would be more justifiable to examine the amendments proposed to the section by different members, and, among them, to the proposal of Mr. Beck, of Kentucky, that no money should be expended upon the property selected by the Governor and Board of Public Works until authority should be first given by Congress, after a report to that body. This amendment was rejected; but it maybe urged with equal plausibility, on the one hand, that Congress rejected it because it determined to vest the final power in •' the city authorities; and on the other, that the reason for the rejection was the belief that the law only authorized an in *572 quiry or preliminary treaty about the land. We are therefore forced to examine the language itself, unassisted by extraneous aids.
It is evident that the principal matter sought to be provided for was the. erection of the, building; but the power to accomplish this is not granted by direct language. It is also evident that the act contemplated the possibility of some “expenditure for the land,” and “payment of purchase-money therefor,” for it expressly takes pains to declare that the United States shall not be liable for either. The particular phrase which has been the great source of discussion, declares that the Governor and Board of Public Works are authorized, if they deem it desirable for the purpose, “to make arrangements to secure sufficient lands,” &c.
It is insisted by the counsel of the District that the words “ make arrangements ” only imply the grant of power to make a treaty or bargain as to the price, terms, &c., and to report their action to Congress; and definitions are read from an eminent lexicographer, (a justifiable source of reference,) which ascribe this signification to the word “arrangement.” But the same high. authority gives the following as one of the significations: “Arrangement — final settlement; adjustment by agreement; as, the parties have made arrangements between themselves concerning their dispute; ” and it is added that this is “ a popular use of the term.” Now, if we substitute this definition where the word occurs in the act, the sentence will read thus: “The Governor, &e., are authorized to make a final settlement, or adjustment, by agreement, to secure sufficient land,” &c.
With this sense — the popular sense,.we are told — giyen to the word, the phrase would certainly confer an authority upon the District of Columbia to take all needful steps to consummate the acquisition of the described territory, even to the extent set forth in the plea. The propriety of adopting this form of expression in the act of Congress, instead of directing the District government to buy the laud, can readily be appreciated when we reflect that any mandatory direction to *573 purchase would have committed the District to place the buildings on the lots, however extortionate might be the demand of the market company as to the price.
It is difficult to understand why Congress should have desired the delay of another year for the return of the report and further congressional action, in view of the fact that the power of acquiring this parcel of land was not one of very uncommon importance, not greater than similar powers constantly conferred by individuals upon private agents, aud not comparable in consequence to the immense powers previously and subsequently confided by Congress to the District government with unstinted hand, and in virtue of which millions of money were expended, and the whole face of the city changed and leveled.
To show that the courts construe such powers liberally and in aid of the object of the grant, we refer to Van Ness v. City of Washington, 4 Peters, 280; City of Georgetown v. Alexandria Canal Company, 12 Id., 97; Washington Corporation v. Great Falls Manufacturing Company, 21 Md.
In the last-named case it appeared that an act of the Legislature of Maryland declared, “ that if the plan adopted by the President of the United States for supplying the city of Washington with water should require said water to be drawn from any source within the limits of the State, consent is hereby given to the United States to purchase such lands, aud to construct such dams, reservoirs, buildings, and other works, and to exercise, concurrently with the State of Maryland, such jurisdiction over the same as may be uecessary for the said purpose.”
In constructing the Washington aqueduct, it was found necessary to build a dam across the Potomac Diver at a point where the laud on both banks belonged to the Great Falls Manufacturing Company. After the building of the dam the Great Falls company obtained from the State of Maryland patents for the land at the bottom of the river, upon which the dam was built, and it was insisted that it was entitled to payment from the United States, in respect of the *574 land thus patented and used by the aqueduct. The Court of Appeals, however, held that the act of the Legislature conferred upon the United States rights of acquisition of the lands necessary for the construction of the aqueduct, which the State was not at liberty to impair by acts of its public officers, and that the United States by its priority of location had secured a priority of right, which must prevail against the subsequent patentee.
In the case in 12 Peters, 97, the court, in like manner, held that the power to build a viaduct to carry the Alexandria caual across the Potomac River at Georgetown, was sufficiently conferred by an act of Congress authorizing the caual company to construct their canal from the terminus of the Chesapeake and Ohio Canal to the city of Alexandria.
We therefore conclude that Congress did, by the fair interpretation of this section of the act, intrust to the District government the power to adopt and conclude all requisite measures to acquire the land described in the law as the site of the contemplated public buildings.
Third. The next question is: Did the city authorities exercise this power in the manner authorized by the law ?
What .the authorities actually did is averred by the plea and admitted by the demurrer. They acquired by deed from the market company the parcel of land, 86 feet in depth, described in the plea, and in consideration of this grant they agreed to reduce the rental to $7,500, in the manner specified in section 2 of the agreement.
Their power to acquire this land is denied by the plaintiff, who claims that these acts on its part were ultra vires and void.
In considering the power of a municipal corporation to do any act appearing to have been performed in the direction of the public welfare, the courts are not inclined to construe its powers parsimoniously, and scrutinize and restrain them within the strictest limits; but they will expound them liberally, to effect the valuable public purposes intrusted to it by the Legislature.
*575 In Glenn v. Mayor and City Council of Baltimore, 5 G. & J., 424, the court hold this language: “A municipal corporation has power to pass all laws necessary or proper to carry into effect any given power, and the degree of their necessity or propriety should not be minutely scrutinized.” And the doctrine of ultra vires, when invoked by a municipality to enable it to avoid its own solemn engagements, is rightly discountenanced by the courts. It is well for the honor and safety of the nation that its highest court, in unmistakable terms, has reiterated its determination to maintain the faith of contracts entered into by corporations, and especially by municipalities, where the only defense interposed is the allegation by the city that it misled others by exercising powers it now insists it did not possess. Unless such defenses were listened to with great caution, it might result in each successive government of a municipality in turn endeavoring to repudiate the acts of its predecessor, and thus the board that sought to evade the entire contract as ultra vires, might in- turn be denounced as having usurped authority in seeking its disaffirmance.
A release of part of the rent was the most obvious mode of accomplishing the acquisition of the property. It would have been a most extraordinary arrangement for the corpora^ tiou to have paid out money for the land to the market company, and for the market company to have continued to pay the entire original rental, after having parted with a large paid of the reservation to the city.
That the municipality had the power to receive the land and execute the release, in our opinion, is fully sustained by the authorities.
A case strikingly maintaining this view of the power of the corporation to execute this release, is Visitors, &c., of St. John's College v. Purnell, Comptroller, &c., reported in 23 Maryland, 629.
In 1784 St. John’s College was incorporated by the State of Maryland. By the act of incorporation it was declared that in consideration that certain public-spirited individuals *576 had subscribed a large sum of money towards founding a college, the State of Maryland bound itself to pay annually, and forever thereafter, as a donation by the public to the use of the said college, the sum of £1,750, “to be applied by the visitors and governors to the payment of salaries to the principal, professors, and tutors,” &c., and the act proceeded to dedicate to the payment of this annuity a sufficient amount from the sums to be received into the treasury from licenses.
In 1805 the Legislature passed an act declaring this provision of the charter repealed. In 1832 a resolution was passed by the Legislature declaring that thereafter there should be paid annually to the visitors and governor the sum of $3,000, on condition that this annuity should be accepted by them in full satisfaction of all legal or equitable claims they might have or be supposed to have against the State under the original law; and requiring them to file an acceptance of these conditions with the clerk of the Court of Appeals, and the college authorities executed an instrument under their corporate seal agreeing to accept the annuity in full satisfaction of their claims; and it was paid to the college for niany years thereafter.
In 1860 the visitors and governor sued out a maudamus to compel the officers of the treasury to pay out the money received from licenses, the original annuity of £1,750, from the time it was withdrawn, averring that the attempted repeal in 1805 was void as against the provisions of the Constitution of the United States forbidding a State to pass any law impairing the obligation of a contract, (as had already been decided in 15 Md., 330.) and insisting further that the release executed by the college authorities in 1832 was ultra vires and void.
After the fullest argument by counsel, the Court of Appeals decided that the visitors and governor were competent to execute the release, and that they were concluded thereby, and could not maintain their action.
We are thus led to the conclusion, which is concurred in by all the members of the court who heard the cause, that *577 the defenses interposed by the special plea and admitted by the demurrer constitute a bar to this action.
The questions we have examined are all that properly arise in the consideration of the case presented by the pleadings. With the consideration so much discussed in the argument, as to the -alleged unwisdom or imputed imprudence of the arrangement, this court can have nothing to do. This is not an application to a court of equity on the part of the city to reform an overreaching bargain imposed upon inexperience or ignorance. It is an action brought by one party for a stipulated rent, upon a contract which the defendant alleges has been lawfully changed by a subsequent competent agreement between the original contracting parties. The only question for the decision of this court, therefore, is whether this subsequent agreement was entered into by competent authority as alleged. Our province is simply to declare the law as, in our judgment, we find it to be.
But it may not be amiss for the court to say that we fail to discover some of the apprehended evils which, it was urged, would result to the city from its settlement with the market company. There is nothing whatever in the negotiations which could be construed as committing the District to erect buildings in the form contemplated by the original charter of the market company. The agreement simply operates to reduce the rental to be paid by the market company,to $7,500, or to such lesser sum as, with the taxes on the-company’s pi’operty, will amount to $13,000 per annum. It creates no obligation, as we construe it, upon the part of the District of Columbia to raise by taxation the $17,500 — the difference between the original and reduced rental — for the use of the poor of the District and the city; for, even if the-District of Columbia were effectually substituted for the mar- - ket company in the fourteenth section of the charter, the operation of the section would then simply be to require the District to pay the money to the District itself, which would work an extinguishment of the rent, upon the principle that where the lessee acquires the fee the rent ceases, and the *578 leasehold title is merged in the fee. (See Cook v. Brice, 20 Md.)
We go further, however, and declare as our opinion that if this were not so, and if the District of Columbia could be held liable to raise the money annually, in a case where the trust was one which could be enforced by law, yet that there could be no such obligation in the present case, where the designation of the beneficiaries, “the poor of the city of Washington and of the District of Columbia,” is so vague .and indefinite as to be incapable of ascertainment, and no persons could show title to claim the benefit of the fund in succession. According to the law governing this District at the time of its cession, such a trust was totally void, as it was in England after the statutes of mortmain, and until the passage of the 43d of Elizabeth concerning charitable uses.
It is settled beyond dispute in Maryland that the statutes of Henry VIII were always in force in that province and State, and they have been reiterated in spirit by the bill of rights of every constitution since the year 1776; and that the statute of Elizabeth never was adopted nor its principles recognized there. (See Wildeman v. Mayor, &c., of Baltimore City, 8 Md., 551; Lingan v. Carroll, 3 H. & McH., 333, decided in 1793; Means v. Marche, 30 Md., 142; Barnes v. Barnes, 3 Cranch C. C., 269; Baptist Association v. Hart, 4 Wheat., 1; Beatty v. Kurtz, 2 Pet., 566.)
These views are not inconsistent with the decisions of the Hupreme Court upon the different- state of facts appearing in Inglis v. Sailor’s Snug Harbor, 3 Pet., 113; Girard’s Will, 2 How.; Ould v. Washington Hospital for Foundlings, 1 MacArthur, 541; and Fontain v. Ravenel, 17 How., 394.
Hpon these grounds the court have unanimously determined that the judgment of the court in special term overruling the demurrer should be affirmed.
Several of the objections insisted on in the argument, but which could not properly be considered under the demurrer— as, that the land selected was not that described in the act of Congress; that it was not a suitable place, &c., together with *579 any other defenses that the able counsel of the plaintiff may decide to present — may be insisted on by replication to^the plea, if they are so advised.
It is a satisfaction to the court to know that whatever errors we may have fallen into may be the subject of review by the highest tribunal in the land.